# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAR 07 2013

~~Madsen, C.J.~~

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on March 1, 2013



Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CATHERINE LAKEY, a single woman;<br>GERTHA RICHARDS, a single woman;<br>MICHAEL HESLOP, a single man;<br>TROY FREEMAN and CAROLINA AYALA de<br>FREEMAN, husband and wife; PATRICK<br>MCCLUSKY and MICHELLE MCCLUSKY,<br>husband and wife; SHAHNAZ BHUIYAN<br>and ANN RAHMAN; husband and wife;<br>STEVEN RYAN and NORA RYAN,<br>husband and wife; KEVIN CORBETT and<br>MARGARET CORBETT, husband and wife;<br>KATHRYN MCGIFFORD, a single woman;<br>and JACQUELYN MILLER, a single woman,<br><br>          Appellants,<br><br>v.<br><br>PUGET SOUND ENERGY, INC., a Washington<br>corporation; and CITY OF KIRKLAND, a<br>Washington municipal corporation,<br><br>          Respondents. | No. 87679-7<br><br>En Banc<br><br>Filed    MAR 07 2013 |

FAIRHURST, J.—Catherine Lakey, Gertha Richards, Michael Heslop, Troy

Freeman and Carolina Ayala de Freeman, Patrick and Michelle McClusky,

Shahnaz Bhuiyan and Ann Rahman, Steven and Nora Ryan, Kevin and Margaret

Corbett, Kathryn McGifford, and Jacquelyn Miller (hereinafter the homeowners) own property bordering a parcel owned by Puget Sound Energy, Inc. (PSE) where an electrical substation has been located for over 50 years. The homeowners sued PSE and the city of Kirkland (City) after PSE constructed a new neighborhood power substation on PSE's property. The homeowners seek review of the trial court's decision to exclude the testimony of their expert under the rule announced in *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), and its ultimate decision to grant summary judgment to PSE on the homeowners' nuisance claim.[1] The homeowners also seek review of the trial court's decisions to apply the provisions of the Land Use Petition Act (LUPA), chapter 36.70C RCW, to their inverse condemnation claim and to grant summary judgment to the City on this claim. Although we reverse the trial court's *Frye* and LUPA rulings, we affirm its decisions disposing of the homeowners' claims.

## I. FACTS AND PROCEDURAL HISTORY

The homeowners each own property near a parcel owned by PSE in the Juanita neighborhood of Kirkland, Washington. PSE bought its property in 1958 and built the original substation in 1960. For 52 years, there has been a substation on the property. In 2008, in order to satisfy growing electrical demand in Kirkland,

---

[1] Because the trial court considered matters outside the pleadings in disposing of the homeowners' claim against PSE, we treat the trial court's order of dismissal as a grant of summary judgment to PSE.

PSE sought to replace the existing substation with a new one. The planned new substation had the added advantage of having two transformers, providing redundancy in case a transformer failed, a feature lacking at the old substation. Because the new substation was larger and did not comply with the City's zoning code, PSE applied for a variance from the applicable ordinances.[2]

The City's hearing examiner approved PSE's variance application after holding a public hearing. The homeowners appealed to the Kirkland City Council, but the council affirmed the variance decision. The homeowners did not appeal the council's decision with a land use petition.

PSE constructed the substation and in early 2010 it went on line. The homeowners thereafter filed suit against PSE in King County Superior Court. The homeowners alleged that the electromagnetic fields (EMFs) emanating from the substation trespassed on their property and constituted both a public and private nuisance. The homeowners claimed they reasonably feared exposure to the EMFs emitted by the substation and that this was injurious to their health and interfered with the use and enjoyment of their property.

PSE moved to dismiss with prejudice all of the homeowners' claims under CR 12(b)(6). PSE argued, among other things, that the homeowners could not

---

[2]The Kirkland Zoning Code requires public utilities located within a residential area to have 20 foot side yard setbacks, "Type A" landscape buffering, and limits buildings to 30 feet in height. Clerk's Papers at 1590. PSE sought a 13 foot setback along the property lines, with associated modifications to the required buffers, and the ability to build structures 35 feet tall.

3

reasonably fear the EMFs emitted by the substation because, PSE contended, the fields have no deleterious health effects. After reviewing PSE's motion, the trial court ordered the homeowners to submit scientific evidence to support their claims.

The homeowners submitted multiple declarations, including sworn statements by experts Dr. Be Kun Li and Dr. David Carpenter, to which they attached scientific studies and statements made by governmental bodies. The homeowners contend these attachments show the adverse health effects of, and therefore the reasonableness of the homeowners' fears of, EMF exposure.

PSE moved to exclude the testimony of Li and Carpenter under ER 702 and the rule announced in *Frye*.[3] The trial court ordered a *Frye* hearing on the admissibility of the testimony.

In the interim between PSE's motion to dismiss and the *Frye* hearing, the homeowners moved to amend their complaint to add the City as a defendant and

---

[3] As the *Frye* court stated:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
293 F. at 1014.

alleged that the City's decision to grant PSE the variance amounted to an inverse condemnation.[4]

At the three day *Frye* hearing, both sides offered expert testimony. The homeowners offered Carpenter who testified that he concluded that EMF was a possible cause of childhood and adult leukemia, Alzheimer's disease, amyotrophic lateral sclerosis, and infertility. Carpenter also testified about the methodology he employed to reach his conclusions. Carpenter explained that he performed no original research. Instead, he performed a literature review, reanalyzing data collected by others as part of peer reviewed epidemiological studies.[5] Carpenter stated that this was a generally accepted practice used by governmental agencies to decide whether to list an agent as capable of causing human disease. Carpenter did admit, however, that he discounted studies and data that showed no EMF-disease link when reaching his conclusions, especially newer studies. He also testified that he reached his conclusions about the health effects of EMF exposure using epidemiological studies alone and without considering toxicological studies.[6]

PSE called Dr. Nancy Lee and Dr. Mark Israel. PSE offered Lee as an expert in epidemiology and she began her testimony with an overview of epidemiological

---

[4]The trial court apparently prompted this decision by asking the homeowners why they had not appealed the council's variance decision under LUPA.

[5]Epidemiology measures the health effects of exposure to an agent by comparing the incidence of disease in exposed and unexposed populations.

[6]Toxicological studies measure the incidence of disease in animals exposed to measured doses of an agent.

practices. Lee explained that epidemiology has protocols to ensure accurate and reliable results. Lee then testified that Carpenter had failed to comply with these protocols by failing to consider all the data relevant to a link between EMF exposure and illness and that his failure to do so violated generally accepted epidemiological practices. Specifically, Lee testified that Carpenter had selectively ignored numerous studies that contradicted his conclusions, including the most recent studies about EMF exposure. Lee also noted that Carpenter had not only selectively ignored studies that disagreed with his conclusions, but he had even selectively ignored data within studies, creating a distorted view of the effects of EMF exposure. Lee testified that this approach also violated established epidemiological protocols.

Both Lee and Israel also testified that proper epidemiological methodology required consideration of the toxicological studies, which showed no correlation between EMF exposure and illness. In their opinion, Carpenter's methodology violated established epidemiological protocols.

The trial court ruled Carpenter's testimony was inadmissible at the end of the *Frye* hearing. The trial court determined that Carpenter's theories lacked general acceptance in the scientific community and that he had failed to follow proper epidemiological methodology, rendering his conclusions unreliable. Consequently, the trial court excluded Carpenter's opinion under *Frye*. After

excluding Carpenter's testimony, the trial court granted PSE's motion "to the extent that [the homeowners] cannot bring a nuisance or trespass claim based on the presence of [EMFs]." Clerk's Papers at 1422.

After hearing the City's motion for summary judgment, the trial court ruled that the homeowners were required to appeal the City's decision to grant the variance under LUPA. Because the homeowners had failed to timely file a LUPA petition, the trial court granted the City summary judgment on the inverse condemnation claim.

The homeowners appealed, and the Court of Appeals certified the appeal to this court pursuant to RCW 2.06.030.

## II.    ISSUES

1.    Did the trial court properly exclude Carpenter's testimony under *Frye* on the nuisance claim to PSE?

2.    Did the trial court properly grant summary judgment on the nuisance claim?

3.    Did the trial court properly interpret LUPA as applying to the inverse condemnation claim brought against the City?

4.    Did the trial court properly grant summary judgment on the inverse condemnation claim?

## III. ANALYSIS

### A.   The Homeowners' Nuisance Claim against PSE

The homeowners assign error to two trial court decisions regarding their nuisance claim against PSE. First, they appeal the trial court's order excluding Carpenter's testimony because they claim that his testimony did not involve novel scientific evidence. Second, they appeal the trial court's ultimate decision to grant PSE summary judgment.

### 1.   *The trial court improperly excluded Carpenter's testimony under* Frye *but properly excluded it under ER 702*

The trial court must exclude expert testimony involving scientific evidence unless the testimony satisfies both *Frye* and ER 702. *State v. Copeland*, 130 Wn.2d 244, 255-56, 922 P.2d 1304 (1996). To admit evidence under *Frye*, the trial court must find that the underlying scientific theory and the "'techniques, experiments, or studies utilizing that theory'" are generally accepted in the relevant scientific community and capable of producing reliable results. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 603, 260 P.3d 857 (2011) (quoting *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994)). To admit expert testimony under ER 702, the trial court must determine that the witness qualifies as an expert and

the testimony will assist the trier of fact.[7] *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993). Unreliable testimony does not assist the trier of fact. *Anderson*, 172 Wn.2d at 600. *Frye* and ER 702 work together to regulate expert testimony: *Frye* excludes testimony based on novel scientific methodology until a scientific consensus decides the methodology is reliable; ER 702 excludes testimony where the expert fails to adhere to that reliable methodology. *Cauthron*, 120 Wn.2d at 889-90.

We review de novo a trial court's exclusion of evidence under *Frye*. *Anderson*, 172 Wn.2d at 600. We review a trial court's decision concerning the admissibility of expert testimony for an abuse of discretion. *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007). A trial court abuses its discretion by issuing manifestly unreasonable rulings or rulings based on untenable grounds, such as a ruling contrary to law. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993).

PSE argues that *Frye* requires the exclusion of Carpenter's testimony because of what it views as his unreliable methodology. *Frye* is implicated only where "either the theory and technique or method of arriving at the data relied upon is so novel that it is not generally accepted by the relevant scientific

---

[7] ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

community." *Anderson*, 172 Wn.2d at 611. While *Frye* governs the admissibility of novel scientific testimony, the application of accepted techniques to reach novel conclusions does not raise *Frye* concerns.[8] *Anderson*, 172 Wn.2d at 611; *State v. Gore*, 143 Wn.2d 288, 302, 21 P.3d 262 (2001) (declaring that *Frye* only examines whether evidence is based on novel scientific methodology), *overruled on other grounds by State v. Hughes*, 154 Wn.2d 288, 110 P.3d 192 (2005); *State v. Roberts*, 142 Wn.2d 471, 520-21, 14 P.3d 713 (2000) (stating that conclusions based on nonnovel methods of scientific proof are not susceptible to exclusion under *Frye*); *Reese v. Stroh*, 128 Wn.2d 300, 306, 907 P.2d 282 (1995); *Frye*, 293 F. at 1014 ("[T]he thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."). In *Anderson*, we noted that using epidemiological studies to reach new conclusions about the correlation between exposure to an agent and disease by comparing the rates of disease in exposed and unexposed populations did not raise *Frye* concerns and is generally accepted. *Anderson*, 172 Wn.2d at 603-04, 611-12. Carpenter performed a literature review and used the data from peer reviewed epidemiological studies to reach his conclusions. *Frye* therefore does not apply to

---

[8]PSE cited *Grant v. Boccia*, 133 Wn. App. 176, 137 P.3d 20 (2006) and *Ruff v. Department of Labor & Industries*, 107 Wn. App. 289, 28 P.3d 1 (2001) in its trial court briefing. These cases required general acceptance of an expert's conclusion about causation in order to admit the expert's testimony. We explicitly overruled this requirement in *Anderson*, which we decided after the trial court made its decision. 172 Wn.2d at 612.

Carpenter's testimony. Any novelty came in Carpenter's conclusions, but novel conclusions do not implicate *Frye. Anderson*, 172 Wn.2d at 611-12.

Further, under *Frye* we only look generally at whether a theory has accepted and reliable mechanisms for implementing it. *Cauthron*, 120 Wn.2d at 888-90. Lee testified that epidemiology has controls to assure the reliable production of data. When a scientific theory has protocols for assuring reliability, an expert's errors in applying proper procedures go to the weight, not the admissibility, of the evidence, unless the error renders the evidence unreliable. *Copeland*, 130 Wn.2d at 270-71. In such cases, the trial court may use other rules, such as ER 702, to exclude the testimony. *Anderson*, 172 Wn.2d at 606; *Cauthron*, 120 Wn.2d at 890.

PSE invites us, alternatively, to affirm the exclusion of Carpenter's testimony under ER 702. The trial court's *Frye* order excluding the testimony found that Carpenter's testimony was unreliable and therefore failed the helpfulness requirement of ER 702. While the parties have framed this appeal as involving a *Frye* issue, we believe the trial court correctly understood PSE's objections to Carpenter's methods as challenging his testimony under ER 702. We affirm the trial court's decision to exclude Carpenter's testimony on these grounds.

Carpenter failed to follow proper methodology, rendering his conclusions unreliable and therefore inadmissible. Carpenter did not consider all relevant data as basic epidemiology required. Carpenter discounted entire epidemiological and

toxicological studies, especially the newer epidemiological studies. Carpenter failed to consider the later, better studies about the links between EMF and health harms, seriously tainting his conclusions because epidemiology is an iterative science relying on later studies to refine earlier studies in order to reach better and more accurate conclusions. Carpenter refused to account for the data from the toxicological studies, which epidemiological methodology requires unless the evidence for the link between exposure and disease is unequivocal and strong, which is not the case here. Carpenter also selectively sampled data within one of the studies he used, taking data indicating an EMF-illness link and ignoring the larger pool of data within the study that showed no such link. Carpenter's treatment of this data created an improper false impression about what the study actually showed.

The trial court possessed the discretion to find that Carpenter's failure to follow proper methodology rendered his epidemiological conclusions unreliable and unhelpful to the jury as a matter of law. Carpenter's admission that he selectively used data created the appearance that he attempted to reach a desired result, rather than allow the evidence to dictate his conclusions. The trial court did not act in a manifestly unreasonable manner in excluding his testimony, and we will not disturb its decision.

2. *The trial court properly granted PSE summary judgment on the nuisance claim*

CR 12(b)(6) allows a defendant to move for dismissal where the pleadings do not state a claim for which a court may grant relief. However, CR 12(b) mandates that where a trial court considers "matters outside the pleading[s]" and does not exclude them, "'the motion shall be treated as one for summary judgment and disposed of as provided in rule 56.'" *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002) (quoting CR 12(b)). Where the trial court has considered matters outside the pleadings, we review a trial court's order as a grant of summary judgment. *Stevens v. Murphy*, 69 Wn.2d 939, 943, 421 P.2d 668 (1966), *overruled on other grounds by Merrick v. Sutterlin*, 93 Wn.2d 411, 610 P.2d 891 (1980).

Here, the trial court considered matters beyond the face of the complaint before ordering the homeowners to justify the merits of their claim. The homeowners complied by providing numerous declarations with attached exhibits. The trial court considered these declarations and the record does not show that the trial court excluded any of these materials, although it did exclude the testimony of Carpenter. Consequently, the homeowners' appeal is reviewed as one from an order of summary judgment.

We review de novo a trial court's decision to grant summary judgment. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). We perform the same inquiry as the trial court and will affirm an order of summary judgment when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.*[9]

Washington's statutory definition of "nuisance" includes activities that "annoy[], injure[] or endanger[] the comfort, repose, health or safety of others." RCW 7.48.120. Where a defendant's conduct causes a reasonable fear of using property, this constitutes an injury taking the form of an interference with property. *Ferry v. City of Seattle*, 116 Wash. 648, 662-63, 203 P. 40 (1922); *Everett v. Paschall*, 61 Wash. 47, 50-53, 111 P. 879 (1910). Importantly, we have indicated that this fear need not be scientifically founded, so long as it is not unreasonable. *Everett*, 61 Wash. at 50-51. PSE contends that the homeowners could not

---

[9]Even if we reviewed the trial court's order as a dismissal pursuant to CR 12(b)(6), we would still affirm the trial court. Just as with an order of summary judgment, we review de novo a trial court's decision to grant a CR 12(b)(6) motion. *San Juan County v. No New Gas Tax*, 160 Wn.2d 141, 164, 157 P.3d 831 (2007).We will affirm the trial court's decision where "it appears beyond doubt that the claimant can prove no set of facts, consistent with the complaint, which would justify recovery." *Id.* We may even consider hypothetical facts to determine whether a trial court properly dismissed a claim. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). Here, the homeowners did not allege that PSE acted unreasonably. PSE would have no liability without such an allegation. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 689, 709 P.2d 782 (1985). As discussed below, we do not believe the homeowners could prove, consistent with the allegations of the complaint, that PSE acted unreasonably.

reasonably fear EMF exposure. But for purposes of summary judgment, we must view the record in the light most favorable to the nonmoving party. The homeowners have placed studies that indicate some risk from EMF exposure, as well as warnings by governmental bodies about avoiding such exposure, in the record. Viewed in the light most favorable to PSE, we must assume the homeowners reasonably feared EMF exposure.

However, even accepting the homeowners' fear as reasonable, we still affirm the trial court's grant of summary judgment because no material issue of fact exists as to the reasonableness of PSE's conduct. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 689, 709 P.2d 782 (1985) ("'In private nuisance an intentional interference with the plaintiff's use or enjoyment is not of itself a tort, and unreasonableness of the interference is necessary for liability.'" (quoting THE RESTATEMENT (SECOND) OF TORTS § 821D cmt. d at 102 (1979))); *Grundy v. Thurston County*, 155 Wn.2d 1, 6, 117 P.3d 1089 (2005) ("'Nuisance is a substantial and unreasonable interference with the use and enjoyment of land.'" (internal quotation marks omitted) (quoting *Bodin v. City of Stanwood*, 79 Wn. App. 313, 318 n.2, 901 P.2d 1065 (1995))).

We determine the reasonableness of a defendant's conduct by weighing the harm to the aggrieved party against the social utility of the activity. *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 17 n.7, 548 P.2d 1085 (1976); *Morin*

15

*v. Johnson*, 49 Wn.2d 275, 280, 300 P.2d 569 (1956). This determination requires us to look to, among other things, the character of the neighborhood where the activity occurs and the "degree of community dependence on the particular activity." *Highline Sch. Dist.*, 87 Wn.2d at 17 n.7; *see also Jones v. Rumford*, 64 Wn.2d 559, 562-63, 392 P.2d 808 (1964). While reasonableness is typically a question of fact, a court may resolve such questions as a matter of law where reasonable minds could come to only one conclusion. *Harvey v. Snohomish County*, 157 Wn.2d 33, 43, 134 P.3d 216 (2006). Given the record here, reasonable minds could not determine that PSE acted unreasonably.

First, and most importantly, the neighborhood, including the homeowners, depends on the substation for the trappings of modern life. The substation provides power for the neighborhood. All manner of devices used in the home require electricity supplied from outside to function. Individuals who work at home, as does at least one of the homeowners, could not earn a living without the electricity provided by PSE. Any schools or businesses in the area similarly depend on the power distributed by the substation for operation. This dependence weighs heavily against the homeowners when we examine the "degree of community dependence" factor and supports that PSE's conduct was not unreasonable. *Highline Sch. Dist.*, 87 Wn.2d at 17 n.7.

Second, PSE has operated a substation on this property for approximately 50 years. Nuisance measures the fit between an activity and the place where the defendant engages in that activity. *Morin*, 49 Wn.2d at 281. The record does not indicate whether the homeowners came to the nuisance by purchasing their property after the establishment of the original substation.[10] *See DiBlasi v. City of Seattle*, 136 Wn.2d 865, 887-88, 969 P.2d 10 (1998). However, the continuous operation of a substation on the site has changed the character of the neighborhood, making PSE's use of its property for this purpose reasonable. The homeowners do not allege any change in the neighborhood that would make PSE's use of its property to distribute power a newly unsuitable use. *Powers v. Skagit County*, 67 Wn. App. 180, 189, 835 P.2d 230 (1992) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)). Given the long history of using this property for distribution of power, we cannot say that PSE's substation does not fit with the neighborhood.

We determine that no reasonable juror could find the harm to the homeowners outweighs the social utility of PSE's conduct. The dependence of the neighborhood on the power distributed from the substation, along with the long use

---

[10]When asked at oral argument, counsel stated that all the homeowners owned their properties before the construction of the new substation but did not clarify if any homeowner owned property before the construction of the original substation. Wash. Supreme Court oral argument, *Lakey v. Puget Sound Energy, Inc.*, No. 87679-7 (Oct. 18, 2012), at 9 min., 8 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

of the property for the very activity the homeowners complain of, leads us to conclude that the social utility of PSE's conduct outweighs the interference with the homeowners' enjoyment of their property due to their fears. The trial court properly granted PSE summary judgment.

B.     The Homeowners' Claim against the City

The homeowners also appeal the trial court's grant of summary judgment to the City. The homeowners contend that because they seek compensation rather than to challenge the City's decision to issue the variance, the trial court erred by applying the procedures of LUPA to their claim, making it time barred. We agree with the homeowners' argument concerning LUPA but nevertheless affirm the trial court's grant of summary judgment because our decision in *Phillips v. King County*, 136 Wn.2d 946, 968 P.2d 871 (1998), precludes the homeowners' suit against the City as a matter of law.

1.     *The trial court improperly applied the provisions of LUPA to the homeowners' inverse condemnation claim*

The homeowners appeal the trial court's determination that LUPA governed their inverse condemnation claim. This raises questions of statutory interpretation, which we review de novo. *Tingey v. Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007).

18

LUPA authorizes the courts to grant relief in six instances, including cases where a land use decision violates a party's constitutional rights. *Lauer v. Pierce County*, 173 Wn.2d 242, 252, 267 P.3d 988 (2011); RCW 36.70.130(1)(f). LUPA claims must be brought within 21 days of the land use decision. RCW 36.70C.060(2)(d), .040(1)-(3). The legislature intended LUPA to be, with certain exemptions, the "'*exclusive* means'" of obtaining "'judicial review of land use decisions.'" *James v. Kitsap County*, 154 Wn.2d 574, 583, 115 P.3d 286 (2005) (quoting RCW 36.70C.030). One exemption is for "[c]laims provided by any law for monetary damages or compensation." RCW 36.70C.030(c).

An inverse condemnation action seeks constitutionally mandated "compensation" for governmental takings. WASH. CONST. art. I, § 16. The homeowners are seeking compensation. They do not seek a judicial review or reversal of the height, setback, or buffer variances.

The City claims that LUPA extends to "damage claims that a plaintiff may have that arise from issuance of [a] land use decision." Resp't City of Kirkland's Appeal Br. at 11. The cases the City cites all involved damage claims where the relief required a judicial determination that the land use decision was invalid or partially invalid; none involved damages claims generally.[11] *See* RCW 36.70C.140

---

[11] *James* involved a challenge to Kitsap County's impact fees by several developers. 154 Wn.2d at 583. The county conditioned the granting of building permits on the payment of these impact fees. *Id.* We held that the developers needed to challenge this under LUPA as the

(listing remedies available through LUPA, including reversal or modification of a land use decision). The cases the City cites are inapposite to the homeowners' claim, which only seeks compensation rather than a reversal or modification of a land use decision.

Further, LUPA provides for judicial review of a local jurisdiction's land use decisions. The superior court is exercising its appellate jurisdiction. Here, the homeowners are making a claim that they could not make before the hearing

---

condition of payment was part of the permit. *Id.* at 583-86. In other words, the plaintiffs needed to show the illegality of part of the permit to succeed on their claims. *Id.* We rejected this as an attack on a land use decision time barred by LUPA. *Id.*

*Mercer Island Citizens for Fair Process v. Tent City 4* involved a challenge by a group attempting to undo the grant of a temporary use permit (TUA). 156 Wn. App. 393, 395-96, 232 P.3d 1163 (2010). The court noted that the claims for damages under 42 U.S.C. § 1983 depended on the invalidity of the permit. The failure to properly challenge the permit therefore doomed those claims:

> But as the case law recognizes, claims for damages based on a LUPA claim must be dismissed if the LUPA claim fails. Because all of the group's claims challenged the validity of the TUA and were therefore subject to LUPA, the group's failure to assert them within LUPA's time limitations requires dismissal of all the claims, including those for damages.

*Id.* at 405 (footnote omitted).

In *Asche v. Bloomquist*, 132 Wn. App. 784, 799-802, 133 P.3d 475 (2006), the plaintiffs filed both public and private nuisance claims against their neighbors for constructing what the Asches contended was a building that exceeded the restrictions found in the county zoning code. A provision of the county code declared that any structure violating the zoning code constituted a public nuisance. *Id.* at 799. The court then reasoned that the public nuisance claim depended on a determination that the county had improperly applied the zoning code to the neighbors' property; it noted that LUPA specifically covered these types of interpretative decisions. *Id.* Thus, the public nuisance claim depended on a challenge to the validity of the permit and failed. *Id.* at 801.

*Shaw v. City of Des Moines*, 109 Wn. App. 896, 37 P.3d 1255 (2002) involved a claim similar to the one in *Mercer Island Citizens*. The plaintiff claimed a land use decision violated his constitutional rights. Discussing his damages claims, the court reasoned that if the city of Des Moines had acted properly, Shaw would not have damages claims. *Shaw*, 109 Wn. App. at 901-02. The claim thus required the plaintiff to prove Des Moines had issued an invalid land use decision.

examiner. *See* RCW 35A.63.170; RCW 36.70.970 (authorizing municipalities and counties to give hearing examiners jurisdiction over permitting activities), Kirkland Municipal Code § 3.34 (creating the office of hearing examiner and authorizing the hearing examiner to make decisions pursuant to the city zoning codes, none of which mention eminent domain or inverse condemnation). The homeowners are not invoking the superior court's appellate jurisdiction and LUPA does not govern their claim.

We hold that LUPA does not apply to the homeowners' inverse condemnation claim and therefore their claim is not time barred.

2. *The trial court properly granted summary judgment on the inverse condemnation claim*

Even though LUPA does not govern the homeowners' claim, we nonetheless affirm the trial court's decision to grant summary judgment to the City. The City argues that the homeowners failed to establish the elements of an inverse condemnation action as a matter of law, based on our decision in *Phillips*, 136 Wn.2d at 946. We agree.

Washington State Constitution article I, section 16 states that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made." A property owner may bring an inverse condemnation claim to "'recover the value of property which has been

21

appropriated in fact, but with no formal exercise of the power of eminent domain.'" *Fitzpatrick v. Okanogan County*, 169 Wn.2d 598, 605, 238 P.3d 1129 (2010) (quoting *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005)). To maintain an action for inverse condemnation, a plaintiff must show "'(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings.'" *Id.* at 606 (quoting *Dickgieser*, 153 Wn.2d at 535).

We rejected governmental liability for permit approval under inverse condemnation theories in *Phillips*. In *Phillips*, after a neighboring development flooded their land, two landowners sued, among others, the county, based on the county's issuance of a permit for the development's drainage system. We declared that permitting did not involve a taking for public use. Concerns about proximate causation and subverting our public duty doctrine undergirded our analysis. *Phillips*, 136 Wn.2d at 960-66. We reasoned that allowing governmental liability merely for granting a permit turned governmental entities into guarantors or insurers for all private development, unfairly making the taxpayers liable for the actions of third parties. We also noted that liability under the permitting theory essentially assumed a duty owed by government to each property owner near to any private development. *Id.* This ran counter to our public duty doctrine. We therefore approved the Court of Appeals decision, holding that inverse

condemnation liability would lie against governmental entities only when the entities "'appropriat[ed] the land, restrict[ed] its use through regulation, or caus[ed] damage by constructing a public project to achieve a public purpose,'" not for permitting decisions. *Id.* at 962 (quoting *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 530, 871 P.2d 601 (1994), *abrogated by Phillips v. King County*, 87 Wn. App. 468, 943 P.2d 306 (1997)).

Here, just as in *Phillips*, we hold that the City has no liability as a matter of law. The City did not directly appropriate any part of the homeowners' lands. The City did not regulate the homeowners' use of their lands. The City did not damage the homeowners' properties by "'constructing a public project to achieve a public purpose.'" *Id.* (quoting *Pepper*, 73 Wn. App. at 530). It merely granted a variance to PSE to enable it to replace an electrical substation already on the property with another one, an act that by law carries no liability for the City.

The homeowners ask this court to read *Phillips* as stating that governments have no liability when they approve a permit based only on "existing law." Appellant's Br. at 18-20. They cite a sentence in *Phillips* supporting this proposition. 136 Wn.2d at 961 ("There is no public aspect when the County's only action is to approve a private development under then existing regulations."). The homeowners argue that the City did not issue the permit under then-existing

regulations because PSE could construct the substation only by virtue of the variance. Appellant's Br. at 18-19. We reject this argument for two reasons.

First, as noted by the trial court, and supported by the record, the City's zoning regulations allowed it to issue a variance for projects. Tautologically, a variance granted under the then-existing Kirkland Zoning Code is granted under the then-existing regulations. Even accepting the homeowners' reading of *Phillips*, the City granted the permit under then-existing regulations and the homeowners may not obtain relief for the City's variance decision. Holding otherwise reads an entire section out of the Kirkland Zoning Code.

Second, the homeowners read *Phillips* too narrowly. We did use the "then existing" language, but only because the case involved the vested rights doctrine. 136 Wn.2d at 961. In several places we reiterated that permit approval does not subject a governmental agency to liability and did so without the then-existing language.[12] The homeowners' restrictive interpretation of the then-existing

_____

[12]For example, we stated that "[t]he County and various amici argue that the Court of Appeals decision improperly equates King County's approval of private development with liability for a public project. We agree." *Phillips*, 136 Wn.2d at 960. Similarly, we wrote that "[t]o the extent the *Wilber* [*Development Corp. v. Les Rowland Construction, Inc.*, 83 Wn.2d 871, 523 P.2d 186 (1974)] case can be read to hold that approval of development alone is sufficient to give rise to liability on the part of a municipality, we overrule it." *Id.* at 961-62. Discussing the public duty doctrine, we also noted that "[i]n light of this doctrine, we reject the contention that a municipality will be liable for a developer's design which causes damage to neighbors when the county's only actions are in approval and permitting." *Id.* at 963. We also wrote that "[a]llowing an eminent domain cause of action based solely on a municipality's approval of private development, where the developer acts negligently and the municipality is

language would create exactly the kind of result we sought to avoid with *Phillips*: governmental agencies would become guarantors for private entities and our public duty doctrine would be seriously undermined. Instead, we read the language of *Phillips* as holding that governments have no liability for inverse condemnation for permitting decisions and reject the homeowners' interpretation.

## IV.   CONCLUSION

We reverse the trial court's exclusion of Carpenter's testimony under *Frye* and the trial court's determination that LUPA governs the homeowners' inverse condemnation claim. However, neither of these decisions requires reversal of the trial court's grant of summary judgment to both PSE and the City. Because the trial court properly determined both PSE and the City were entitled to judgment as a matter of law, we affirm its summary judgment decisions.

---

not actively involved in the project, would be an end-run around this Court's law on the public duty doctrine." *Id.* at 964. We summed up our analysis by stating:

> The question of when legal liability attaches to one's acts is a policy question, and legal liability is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. A governmental entity does not become a surety for every governmental enterprise involving an element of risk. Mere approval of a private developer's plans does not give rise to an action for inverse condemnation.

*Id.* at 965 (citations omitted).

Fairhurst, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

González, J.

Chambers, J.P.T.