# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHARON L. HARTZELL, a single woman; JUDY L. HARTZELL, a single woman, in her capacity as the Attorney-in-Fact for Sharon L. Hartzell, | No. 51391-9-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| DOROTHY M. THOMAS, a single woman, | |
| Respondent. | |

BJORGEN, J. — Sharon L. Hartzell, and Judy Hartzell, in her capacity as the attorney-in-fact of Sharon L. Hartzell,[1] brought suit against Dorothy Thomas for conversion and fraud relating to transactions concerning the family home. The Hartzells appeal the superior court's order granting summary judgment in Thomas' favor and dismissing the Hartzells' complaint.

The Hartzells argue that the superior court erred when it granted summary judgment based on the three-year statute of limitations for conversion and fraud because their causes of

---

[1] We refer to Sharon or Judy by their first name when discussing them individually and as the Hartzells when discussing them collectively in their capacity as the appellants in this matter.

No. 51391-9-II

action did not accrue until they discovered facts constituting the fraud.  In addition, the Hartzells

assign error to the superior court's refusal to apply the doctrine of equitable tolling.

We reverse and remand for further proceedings.

FACTS

A.      Substantive Facts

Sharon is the mother of eight children, including Judy and Dorothy.

In 1996, Sharon owned a home located in Port Townsend, in which she had resided since

1971.[2]  In the early summer of 1996, Sharon recognized that her home needed a variety of

improvements.  She contacted her nephew, a contractor, who estimated that the home

improvements would cost about $30,000.  Unable to obtain financing on her own, Sharon and

Dorothy agreed that Dorothy would cosign a loan so that Sharon could make the improvements

to her home.

On July 24, 1996, Sharon executed a quitclaim deed, giving her daughter, Dorothy, a 50

percent interest in the home, as a tenant in common.[3]  The quitclaim deed was notarized and

recorded by the county auditor.

On July 30, Dorothy cosigned a loan for Sharon with a principal amount of $62,000.  The

loan settlement statement indicated that Sharon's outstanding mortgage obligation prior to

obtaining the loan was $2,981.83.

---

[2] Sharon and Judy still reside at this property.

[3] There are no facts on the record indicating that Sharon was incompetent at the time she
executed the quitclaim deed, although there are facts on the record indicating that she was
declared legally blind around 1990.

On January 16, 2004, Sharon signed another quitclaim deed, which granted Sharon's remaining 50 percent interest in the home to Dorothy, as a gift from mother to daughter. The quitclaim deed was notarized and recorded. After this conveyance, Sharon no longer had record ownership of the home.

As record owner of the home, Dorothy has since obtained multiple deeds of trust in her name borrowing against the home's equity.

On May 18, 2015, Sharon appointed Dorothy and Judy as her attorneys-in-fact. On December 21, Sharon revoked Dorothy's appointment and appointed Judy as her sole attorney-in-fact.

B.      Conflicting Declarations and Deposition Testimony

In her declaration supporting summary judgment, Dorothy stated,

> In 1996, at the age of 59, my mother asked me to assist her in re-financing her home so that she could do some improvements and repairs. I agreed to help her and we sought professional advice from a bank loan officer. We were, at that time, informed that the best way to accomplish our goals included my being on title with my mother. It was based upon this advice that my mother granted me a 50% interest in the property. We thereafter obtained the loan and it was used to remodel and make repairs on the house, as well as to help each of us financially. I made all payments on the loan.

Clerk's Papers (CP) at 24. Dorothy continued:

> In 2004, at the age of 67, my mother again felt she needed a loan to help pay expenses she had incurred since 1996 and to pay for more repairs and maintenance on her aging home. She asked me again to help her obtain this financing. We again sought professional assistance and obtained a loan. In the process of doing so we were told that my mother's income status was not sufficient upon which to borrow the money we sought. As a result of this information it was decided that I alone would borrow the money. Based upon the advice we were given, it was also decided that I should be the sole owner of the property. There was not then, and never has been, a question but that my mother could continue to live in the home for her lifetime[.] The mortgage loan proceeds were used in large part for

maintenance and repairs at my mother['s] request and I have been solely responsible for repayment of the loan.

CP at 24. Dorothy also declared that,

Each time my mother and I applied for and got mortgage loans, and consulted with loan professionals, my mother was present. To the best of my knowledge and understanding, she was as fully informed and knowledgeable about the processes we were involved in for obtaining the loans as I was based upon the information provided to us by the loan professionals. My mother signed loan documents in the presence of loan professionals.

CP at 24.

When asked about the 1996 quitclaim deed giving Dorothy one-half interest in the home, Sharon stated in her deposition that she had "no clue" what that document meant. CP at 87. She stated,

I mean, you could read that document to me until the cows come home, and I didn't comprehend it. But I did not know I was giving her an interest, because I just thought she [Dorothy] was going to be a cosigner just to help me get the loan, but I was paying her back.

CP at 87-88. The deposition continued:

Q. So you understood she was going to cosign for the loan?
A. Yes.
Q. And you also signed the loan?
A. Yes.
Q. But was it your understanding that you were going to give her a one-half interest in the property?
A. No, no. Because she knew from the time she was approximately 12 years old when we moved into the house, that if something happened that house was to be kept in all eight, for all eight kids, not just one.

CP at 88. When asked about the 2004 quitclaim deed, which granted Sharon's remaining interest in the home to Dorothy, Sharon stated,

I recall it, but I don't remember – I don't – I didn't realize I was giving her the home. Because she called me up and said that the loan company wanted her name

to be first on the loan.  And she said we're going to swap places, it's just on paper, it's not legal.

CP at 91-92.  The colloquy continued:

Q.  So you never had any intention, then, to give her [Dorothy] the entire property—
A. No.
Q. –in 2004?
A.  Heavens, no.

CP at 92-93.

When Sharon was asked why she would sign the documents without having someone else look at them, she stated, "I had somebody probably read them to me."  CP at 97.

C.      Discovery of Will

In Judy's declaration, she declared,

In late 2015, Shirley[4] was visiting with me and Sharon and she asked if Sharon . . . had a Will.  Sharon said that she had signed a Will that Dorothy had prepared for her, and we looked around the house to help her find it.  Shirley and I had never previously known anything about the existence of this Will.  We then read the Will and were astounded to discover that the Will left 100% of Sharon's Estate to Dorothy!  Sharon was just as surprised as Shirley and me, and said that she had never intended to leave her estate to anyone other than all eight of her children.
The discovery of the Will prompted me to delve further into Sharon's financial affairs and Dorothy's activities.  I checked with the King County Assessor's office and found that Dorothy was now the record owner of 100% of the Property, by virtue of the 1996 and 2004 deeds.

CP at 41.  Judy declared that December 2015 was the first time that Sharon, herself, and the other siblings had actual knowledge that Sharon had signed quitclaim deeds granting the home to Dorothy.

---

[4] Shirley Page is another of Sharon's daughters.

D.      Procedural Facts

On March 21, 2016, the Hartzells filed a complaint against Dorothy for conversion and fraud. The complaint alleged, without specificity, that through deception, fraud, and/or undue influence, Dorothy persuaded Sharon to sign two quitclaim deeds, which together granted Dorothy sole ownership of the home. It alleged that due to her blindness, Sharon did not understand what she was signing. It further alleged that Sharon never intended or understood that she was granting her home to Dorothy. The complaint also alleged that after the home was in her name, Dorothy obtained various deeds of trust that borrowed against the property's equity. Finally, it alleged that Sharon, Judy, and her other siblings only recently discovered the grant of the home to Dorothy.

In her answer to the complaint, Dorothy admitted to cosigning loans for Sharon, but denied using any deception, fraud and/or undue influence to persuade Sharon to execute the quitclaim deeds. Dorothy presented various affirmative defenses and asserted, among other things, that the Hartzells' claim was barred by the applicable statute of limitations.

Dorothy moved for summary judgment. The motion argued (1) the statute of limitations had run, (2) the Hartzells had failed to raise a genuine issue of material fact regarding the exception to the statute of limitations based on delayed discovery, and (3) the Hartzells had failed to raise a genuine issue of material fact supporting their conversion and fraud claims.

In their opposition to summary judgment, the Hartzells argued that the applicable statute of limitations did not bar their claims because of the discovery rule. The Hartzells contended that Sharon's disability prevented her from understanding the fraud, which had been perpetrated

6

on her. In addition, the Hartzells claimed that the trial court should apply the doctrine of equitable tolling based on the circumstances of their case.

The superior court granted summary judgment in Dorothy's favor and dismissed the Hartzells' complaint. Aside from its list of material considered, the superior court's order states simply, "Defendant Thomas's motion for summary judgment is GRANTED." CP at 127-28. The court's basis for its decision may be seen in the two appellate decisions listed among the documents it considered: *Strong v. Clark*, 56 Wn.2d 230, 352 P.2d 183 (1960) and *Stueckle v. Sceva Steel Bldgs.*, *Inc.*, 1 Wn. App. 391, 461 P.2d 555 (1969) and their progeny. In *Strong*, our Supreme Court held, among other matters,

> When the facts upon which the fraud is predicated are contained in a written instrument which is placed on the public record, there is constructive notice of its contents, and the statute of limitations begins to run at the date of the recording of the instrument.

56 Wn.2d at 232. In *Stueckle*, Division Three of our court noted, "The statute of limitations may be tolled by the concealment of material facts, misrepresentations, or a promise to pay in the future." 1 Wn. App. at 393.

Because these cases are listed in the order granting summary judgment, we read the order as deciding the statute of limitations and equitable tolling issues, but not reaching the merits of whether the Hartzells had failed to state a claim on which relief can be granted for conversion and fraud.

The Hartzells appeal.

7

ANALYSIS

I. SUMMARY JUDGMENT

The Hartzells argue that the superior court erred when it granted summary judgment based on the statute of limitations. We agree that the superior court erred.

A.     Standard of Review

We review a trial court's order granting summary judgment de novo. *Lyons v. U.S. Bank Nat'l Ass'n*, 181 Wn.2d 775, 783, 336 P.3d 1142 (2014). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

B.     Question of Fact Regarding Discovery of Alleged Conversion and Fraud

The trial court is charged with applying the appropriate statute of limitations based on the gravamen of the complaint. *Aberdeen Fed. Sav. & Loan Ass'n v. Hanson*, 58 Wn. App. 773, 776, 794 P.2d 1322 (1990).

Conversion claims are subject to a three-year statute of limitations. RCW 4.16.080(2); *Crisman v. Crisman*, 85 Wn. App. 15, 19, 931 P.2d 163 (1997). In some cases, there can be a delay between an alleged injury and the plaintiff's discovery of it. *Id*. at 20. When the delay is not caused by the plaintiff sleeping on his rights, the discovery rule may apply to conversion claims. *Id*. at 20-22.

Fraud claims are also subject to a three-year statute of limitations, and "the cause of action in such case [is] not to be deemed to have accrued until the discovery by the aggrieved

party of the facts constituting the fraud." RCW 4.16.080(4); *see also Aberdeen*, 58 Wn. App. at 776 (holding the three-year statute of limitations applies to an action to set aside a deed based on an allegation of fraud); *Strong*, 56 Wn.2d at 232.

The discovery rule tolls the statute of limitations to the date the plaintiff knows or should have known—through the exercise of due diligence—all the facts necessary to establish a legal claim. *Crisman*, 85 Wn. App. at 20. In the context of this case, the discovery rule applies "where the defendant fraudulently conceals a material fact from the plaintiff and thereby deprives the plaintiff of the knowledge of accrual of the cause of action." *Id*.

Whether an act of fraud could have been discovered is a question of fact. *Aberdeen*, 58 Wn. App. at 776. Actual knowledge of the fraud will be inferred if the aggrieved party, by the exercise of due diligence, could have discovered it. *Strong*, 56 Wn.2d at 232. One is charged with constructive notice if the fraud could have been discovered by examining the record and if "'ordinary prudence and business judgment'" required examination of the record. *Aberdeen*, 58 Wn. App. at 777 (quoting *Irwin v. Holbrook*, 32 Wash. 349, 357, 73 P. 360 (1903)).

The Hartzells' complaint for conversion alleged that Dorothy misled Sharon as to the nature of the quitclaim deeds through fraud, misrepresentation, and/or undue influence. The evidence Sharon presented to the superior court demonstrated that the claim depended entirely on whether the quitclaim deeds were acquired by fraud, misrepresentation, and/or undue influence. The Hartzells did not present the superior court with any other alternative basis to support their action for conversion and fraud.

Thus, the three-year statute of limitations, RCW 4.16.080(2), (4), applies to the Hartzells' claims. The quitclaim deeds were signed, notarized, and recorded in 1996 and 2004,

respectively, and would generally work to bar her lawsuit, which was filed well beyond the three-year statute of limitations. The Hartzells, however, assert that even if the three-year statute of limitation applies to their claims, their claims were timely because the limitations period began to run only on their discovery of the alleged fraud.

Turning to the record, on the one hand it is undisputed that Dorothy is Sharon's daughter and that Sharon trusted Dorothy to assist her in obtaining various loans. Sharon claims she did not know she was signing the home away and that it was not her intent to do so. The record shows that Dorothy told Sharon, "[W]e're going to swap places, it's just on paper," and that "it was [Dorothy's] understanding . . . [that] the home was still [hers]." Further, there was an absence of any red flags for Sharon.

On the other hand, it is undisputed that Sharon signed the quitclaim deeds, the deeds contained the legal description of the property, and the deeds were notarized and recorded on the public record in 1996 and 2004, respectively. Although Sharon claims she did not know or understand the contents of what she signed, she admits that the quitclaim deeds were "probably" read to her in the presence of loan officers and notary publics. CP at 97. Further, there are no facts on the record to support that Sharon was incompetent when she signed the quitclaim deeds, and the Hartzells have not claimed that she was.

The record thus shows that there are genuine issues of material fact as to whether an act of fraud could have been discovered, whether Sharon had actual or constructive knowledge of the alleged fraud, and whether Sharon exercised due diligence and "ordinary prudence and business judgment" regarding discovery of the alleged fraud. Therefore, under CR 56(c) the

10

superior court erred when it granted summary judgment in Dorothy's favor based on the applicable statute of limitations.[5]

## CONCLUSION

We reverse and remand for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Lee, A.C.J.

Melnick, J.

---

[5] Because we hold the superior court erred when it granted summary judgment, we need not reach the issue of equitable tolling.