**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| In the Matter of the Personal Restraint of | No. 53913-6-II |
|---|---|
| GREGORY ALLEN SCHIRATO, | |
| Petitioner. | UNPUBLISHED OPINION |

GLASGOW, J—After a work holiday party, AL went to a bar with some colleagues, including Gregory Schirato. AL went home alone and was intoxicated when she fell asleep. Sometime during the night, Schirato broke a window, entered her home, and sexually assaulted AL. A jury found Schirato guilty of second degree rape and first degree burglary. In this personal restraint petition (PRP), Schirato challenges his convictions or, alternatively, seeks a reference hearing.

Because AL did not see her assailant, the police conducted an investigation before charging Schirato. The State obtained a warrant to seize the clothes Schirato wore that night. At trial, the State presented evidence that glass fragments found on Schirato's clothing could have been from glass in the door of AL's home that was broken during the burglary. In addition, the State presented evidence that male and female DNA consistent with a mixed profile of Schirato and AL was on a bra that AL wore to bed that night.

Schirato argues that his constitutional rights were violated because the affidavit in support of the State's search warrant application contained material false statements and omissions made intentionally or with reckless disregard for the truth. Schirato contends that he received ineffective

assistance of counsel on eight grounds, including that his counsel failed to move to suppress the glass evidence under *Franks v. Delaware*.[1]

None of Schirato's arguments merits reversal or a reference hearing. Schirato's constitutional rights were not violated when the State executed the search warrant because the warrant was supported by probable cause. Likewise, Schirato's trial counsel was not ineffective for failing to file a *Franks* suppression motion because he would not have prevailed. None of Schirato's other ineffective assistance of counsel arguments entitles him to relief.

We deny Schirato's PRP.

FACTS

A.    Background

In 2014, AL was on the executive team of a state agency in Olympia. In December, AL went to a work dinner party at a restaurant in Olympia. AL had a cocktail and wine at the party.

At the party, AL and two other coworkers, including Schirato, took photographs together because they were wearing new shoes. The photographs showed Schirato's brand new brown leather dress shoes, as well as his suit and shirt.

After a few hours at the restaurant, AL, Schirato, and two other coworkers, Jennifer Quan and Kelly Cunningham, went to a bar in downtown Olympia where they drank, played shuffleboard, and talked. AL testified that Schirato bought her at least two drinks at the bar.

AL testified that she left the bar between 11:30 p.m. and 11:40 p.m. because she felt too drunk. AL recalled swerving on the drive home and struggling to park in her narrow garage. At trial, AL acknowledged that it was a bad decision to drive home.

---

[1] 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

AL lived alone in a house in Olympia. Her house had a front door and a basement door accessible from the backyard. AL did not use the basement door and always kept it closed and locked.

AL fed her cats, washed her hands, and changed out of the dress and bra she wore to the party and into pajamas and a different bra that she wore only when sleeping and had never worn out of the house. AL used the bathroom, rinsed her hands, and filled a glass of water. AL testified that she turned off her light and "fell asleep pretty hard immediately." Verbatim Report of Proceedings (VRP) (Jan. 8, 2018) at 136.

B.      Overnight and Early Morning

At some point in the night, AL found herself "in somewhat of a dream state, but slightly conscious," and felt someone's hands on her back, unclasping her bra, touching her breasts, pulling down her pajama pants and underwear, touching her buttocks, and inserting what she believed to be a finger into her vagina. VRP (Jan. 8, 2018) at 136-39. At first, AL thought her boyfriend, Steve Anderson, who had a key to her house, had entered and gotten into bed with her. She did not participate in the touching or see the person touching her. AL testified that she was in a semiconscious state the entire time, she was not fully awake, and her body felt limp.

In the early hours of the morning, AL found her pajama pants partway down and her light on. She did not give it much thought because she was "pretty out of it still." VRP (Jan. 8, 2018) at 140. AL kicked her pajama pants all the way off because she felt hot and turned off the light, which she could reach from her bed.

When AL awoke to her alarm at 6:30 a.m., she expected to see Anderson in her bed, but he was not there. AL then discovered that her bra was unclasped and her underwear was pulled down. AL immediately called Anderson asking if he had been in her house during the night.

3

Anderson told her that he had not been at her house. He asked AL if she had brought someone home, and she said she had not.

AL went to check the house. The front door was locked as usual. AL went downstairs to her basement where she discovered that the glass window in the basement door was broken, there was glass on the floor and stairs, and the basement door was slightly ajar. AL called 911.

C.      Initial Investigation

Detectives examined AL's house and yard for evidence. They discovered shoe prints in the side and backyard of the house near the basement door, which they photographed and casted. The detectives also collected broken glass from the basement door.

AL gave a recorded statement consistent with the facts above to the lead investigator, Detective Corey Johnson. Another officer brought AL to the hospital for a sexual assault examination. Johnson interviewed Anderson. Another detective spoke to Wesley Kirkpatrick, AL's next door neighbor. Johnson interviewed Quan, Cunningham, and Schirato. After his conversation with Schirato and the others, Johnson identified Schirato as a person of interest.

A few days after the incident, AL went to Nordstrom, where she found and photographed the brand and style of shoes that Schirato wore on the night of the party. AL sent the photographs of the shoes to Johnson.

D.      Search Warrant

Johnson applied for a warrant to search Schirato's house, seize shoes and clothes resembling those he had worn to the party, and collect Schirato's DNA. The affidavit in support of the warrant application contained the following additional information.

The shoe prints found in AL's backyard "appeared to have been caused by a male dress shoe." PRP at 47. The prints seemed to have been made by a treadless shoe with "a smooth wide

sole and short wide heel." *Id.* Johnson compared photos of the shoe prints outside AL's house to the photo of the Nordstrom shoes. The curvature of the heel in the prints was consistent with the curved heel in the photograph of the Nordstrom shoes.

Johnson interviewed Anderson, AL's boyfriend at the time of the incident. Anderson said AL had mentioned a coworker named Greg who often hit on and "made passes at her." PRP at 49. The affidavit also discussed other men with whom AL had had a sexual relationship who had been to her house within two years of the incident, and Johnson contacted all of them. The affidavit also stated that AL's next door neighbor, Wesley Kirkpatrick, told Johnson he saw a small, silver, SUV-style vehicle approach AL's house suspiciously a few weeks before the incident.

The affidavit stated that AL and Schirato had a social relationship and AL had at least one consensual sexual encounter involving Schirato. AL reported that Schirato "pushes her to drink to excess." PRP at 51. But on two previous occasions AL fell asleep after drinking at parties at Schirato's house and awoke to find Schirato fondling her while she slept. The first time, AL was spending the night with her then-boyfriend in a guest bedroom. Schirato inserted his finger into AL's vagina while she was sleeping. The second time, AL had fallen asleep on a couch and awoke to Schirato "fondling her body" underneath her sundress. PRP at 53. The affidavit also stated that Schirato had been investigated for a 2003 incident in which he was accused of fondling a 16-year-old female babysitter in her sleep.[2] No charges were filed as a result of this incident.

In September 2014, Schirato went to AL's home to look at vacation photos. Schirato commented on photos of AL in a bikini, stating that she was the perfect woman and he was jealous of her boyfriend. In November 2014, Schirato asked to stay at AL's house because he was too

---

[2] While this information was included in the affidavit to support the search warrant, all of these prior incidents were excluded at trial.

drunk to drive home. AL told him no and offered to pay for a hotel room for him instead. Schirato declined and drove himself home. Quan reported that while at the bar after the party in December 2014, Schirato pointed to the inner thigh area of AL's crossed legs and told Quan to stick her hand between AL's legs. Quan refused and told Schirato to do it himself. Schirato later moved to the chair next to AL, but Quan said she did not see Schirato touch AL.

The affidavit also described Johnson's interview with Schirato, who said that he had been at the dinner party and bar, was wearing a suit and new dress shoes, bought AL drinks, and played shuffleboard at the bar. Schirato stated that he, Quan, and AL all left the bar at the same time, between 12:30 a.m. and 1:30 a.m. Schirato said he arrived home between 1:30 and 2:00 a.m. Schirato noted that he was close friends with AL and acknowledged a sexual relationship with AL, commenting, "'we play together regularly and I'll leave it at that.'" PRP at 52. He also stated he had last been to AL's house before Thanksgiving 2014.

Johnson wrote in the affidavit that Schirato told him he drove a "small silver Mazda SUV." PRP at 53. Johnson also wrote, "I checked Schirato's name through the Department of Licensing . . . and found he was the registered owner of a 2008 Mazda M3S." PRP at 53. Schirato owned a 2008 Mazda M3S, which is a sedan. The affidavit further stated, "Schirato drives a similar vehicle to the suspicious vehicle seen in [AL's] driveway two weeks prior to the assault." PRP at 54.

The trial court granted the search warrant. Schirato voluntarily provided the suit and shirt he wore to the party, noting they had just been dry cleaned. Schirato said he had lost the dress shoes on a recent trip.

Schirato was later charged with second degree rape and first degree burglary.

E.      Glass Evidence

Johnson sent Schirato's seized clothing to the Washington State Patrol Crime Laboratory. State Patrol forensic scientist Susan Wilson found glass fragments on the clothing. Wilson was not yet qualified as a forensic glass scientist and in early 2015, the State Patrol's laboratory was not equipped for glass analysis. Wilson sent the glass fragments from Schirato's clothing and the glass from AL's broken window to the FBI laboratory. The FBI laboratory concluded the fragments from Schirato's suit were too small to test using its refractive index analysis instrument, one of several forensic techniques used to identify the physical and chemical characteristics of glass to assess whether glass fragments could share a common origin.

By summer 2016, the State Patrol laboratory was equipped to perform forensic glass analysis and had sensitive instruments capable of handling very small glass fragments. Forensic scientist Daniel Van Wyk had become certified in glass analysis. Van Wyk conducted refractive index analysis on the glass fragments found on Schirato's clothing and on the glass from AL's window. He concluded that the glass fragments in Schirato's clothing could have come from the broken window glass from AL's basement door.

Schirato's trial counsel hired his own glass expert, Skip Palenik, to review the FBI's and Van Wyk's reports. Palenik wrote in a pretrial report, "the analytical results . . . and the incomplete and contradictory nature of [Van Wyk's] report do not meet the . . . rigor required of a scientific glass comparison . . . to support legal proceedings." Clerk's Papers (CP) at 237. Palenik did not independently test the glass.

Schirato researched glass evidence and found a 1971 scientific article discussing glass fragments found on men's clothing brought to a British dry cleaner. Richard Woodrow, petitioner's trial counsel, e-mailed the article to Palenik but did not introduce or discuss the article at trial.

F.    Trial

At trial, the State presented evidence that male and female DNA consistent with a mixed profile of Schirato and AL was on the clasp of the bra AL wore to bed on the night of the December 2014 party. The DNA analysis excluded Anderson, AL's boyfriend, as a source. The State also introduced photographs of the shoe prints in AL's yard and the Nordstrom shoes.

Van Wyk testified that he used x-ray fluorescence, comparison of element intensity ratios, and refractivity analysis to test the glass fragments. He concluded that the glass fragments from Schirato's clothes could have been from the glass in AL's door. Van Wyk explained that his report was peer reviewed by Oregon State Patrol scientists, who found no problems with the substance of his analysis. In response to cross-examination questions about whether the fragments from Schirato's clothing were too small for reliable refractivity analysis, Van Wyk explained that his assessment of whether the fragments were too small was not "based on any set number," but reflected a holistic assessment of the fragment. VRP (Jan. 16, 2018) at 701.

Palenik testified for the defense. He agreed that Van Wyk used appropriate scientific methods, but found Van Wyk's work imprecise. Palenik criticized Van Wyk for comparing fragments of different sizes and including data with relative standard deviations that were too high. Palenik questioned the validity of Van Wyk's conclusion that the glass found in Schirato's clothes and in AL's basement could have had a common origin. On cross-examination, the State noted that Van Wyk eliminated the data with the highest relative standard deviations. Palenik said this assuaged his criticism somewhat, but stated on redirect, "regardless of how it's put, this data does not have the precision that it should." VRP (Jan. 22, 2018) at 1059-60.

Van Wyk and Palenik agreed that scientists typically refrain from saying that glass fragments "match" unless they physically fit together. VRP (Jan. 16, 2018) at 688; VRP (Jan. 22,

2018) at 1065. Rather, if there are no indications that the glass originated from different sources and the samples have certain common characteristics, scientists conclude that the glass *could* have come from the same source.

In her closing argument, the prosecutor said that scientists typically do not use the word "match" for glass evidence:

> We have a comparison of the glass. He wouldn't use the word "match." They don't like to use the word "match." The glass scientist -- neither of the glass scientists wanted to use the word "match." They said "possible" is the best we're going to get. The glass found on the defendant's suit, it's possible it's the same glass found at [AL's] house.

VRP (Jan. 23, 2018) at 1221. But later in her rebuttal argument, the prosecutor argued that the glass from Schirato's clothing "matched" the glass from AL's door. VRP (Jan. 23, 2018) at 1262. She also noted that the jury was to judge the credibility of witnesses and argued that AL "told you what she remembered and did so to the best of her ability. She swore to tell the truth and she did so." *Id.*

G.     Conviction, Appeal, and PRP

The jury found Schirato guilty of second degree rape and first degree burglary. He filed a direct appeal but voluntarily dismissed it. He then filed this PRP.

Schirato supports this PRP with his own declaration and two expert declarations, including one from Wayne Fricke, a defense attorney not involved in Schirato's case. Fricke opines that Woodrow provided ineffective assistance of counsel.

In its response to Schirato's PRP, the State submits an affidavit from the Oregon State Police forensic scientist who peer reviewed Van Wyk's report and concludes that Van Wyk used scientifically accepted procedures and methodologies. The State also submits an extensive declaration from Schirato's trial counsel, Woodrow, who explains that his representation of

Schirato was not ineffective and describes the strategic reasons for his pretrial and trial decisions. Woodrow reviews at length the evidence supporting the application for the search warrant, explaining why he believed a motion challenging the warrant's validity would have been denied. He also describes why he did not seek a *Frye*[3] hearing on Van Wyk's glass comparison methods and that his decisions regarding the FBI report and the defense expert were tactical.

ANALYSIS

I. EVIDENCE ON REVIEW

The State asks this court to disregard Fricke's declaration because he "does not have specialized knowledge that this [c]ourt lacks," making "his opinion improper under ER 702 and irrelevant." Resp. at 44. We disagree.

Washington courts have considered declarations from outside attorneys in support of a PRP. *See In re Pers. Restraint of Burlingame*, 3 Wn. App. 2d 600, 610 n.1, 416 P.3d 1269 (2018) (considering a declaration in support of the PRP from an outside criminal defense attorney who opined as an expert that Burlingame's trial counsel was constitutionally ineffective and agreeing with that attorney's reasoning even though the declaration was "not necessary to [its] conclusion"); *see also In re Pers. Restraint of Cross*, 180 Wn.2d 664, 693, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). This court may thus consider Fricke's declaration, but we give it minimal weight to avoid the "distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also Cross*, 180 Wn.2d at 694.

---

[3] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

## II. BURDEN FOR OBTAINING COLLATERAL RELIEF

### A. PRP Standards

Relief via a collateral challenge to a conviction is an "extraordinary" remedy, and a petitioner bringing a PRP "must meet a high standard before [we] will disturb an otherwise settled judgment." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). A personal restraint petitioner must establish that their restraint was the product of either a constitutional error that caused "actual and substantial prejudice" or a nonconstitutional fundamental defect that "'inherently result[ed] in a complete miscarriage of justice.'" *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810-12, 792 P.2d 506 (1990)).

When considering whether a constitutional error alleged in a PRP was prejudicial, courts look to the "practical effects that result from the error." *In re Pers. Restraint of Yates*, 180 Wn.2d 33, 41, 321 P.3d 1195 (2014); *see also State v. Buckman*, 190 Wn.2d 51, 64, 409 P.3d 193 (2018). The petitioner has the burden of proving prejudice by a preponderance of the evidence under the totality of the circumstances. *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013). The petitioner must support claims of error with a statement of facts on which the claims are based and must identify the evidence supporting the factual allegations. RAP 16.7(a)(2)(i); *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010). The petitioner cannot rely solely on conclusory allegations. *Monschke*, 160 Wn. App. at 488. If the petitioner's allegations are based on matters outside the existing record, they must demonstrate competent, admissible evidence to establish the facts that entitle them to relief. *In re Pers. Restraint of Rice*,

118 Wn.2d 876, 886, 828 P.2d 1086 (1992). The State is held to this same standard in its response. *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 780, 192 P.3d 949 (2008); *see also* RAP 16.9.

Schirato alleges that two types of constitutional errors occurred—an unconstitutional search and seizure and ineffective assistance of counsel. Schirato argues that his constitutional rights were violated because the State's affidavit supporting its search warrant application was insufficient to establish probable cause. Schirato raises multiple ineffective assistance of counsel arguments.

B.      Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *Strickland*, 466 U.S. at 687; *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Ineffective assistance of counsel is a two-pronged inquiry. *Grier*, 171 Wn.2d at 32. Schirato must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced him *Id.* at 32-33. A failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Appellate courts apply "exceptional deference . . . when evaluating counsel's strategic decisions," and "[i]f trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim . . . [of] ineffective assistance of counsel." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). A petitioner must prove that "counsel's performance fell below an objective standard of reasonableness in light of all the circumstances." *Id.* at 538. Where a strategic basis for counsel's tactic has been identified, and the defendant has failed to adequately rebut that assertion with evidence in the record, the

Washington Supreme Court has held that the defendant failed to show their counsel performed deficiently. *State v. Linville*, 191 Wn.2d 513, 524-25, 423 P.3d 842 (2018).

Even if an appellate court concludes that trial counsel's performance was deficient, the petitioner must also prove prejudice. A petitioner must show that, but for counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *Lui*, 188 Wn.2d at 538. We examine the "practical effect" of alleged ineffective assistance. *Yates*, 180 Wn.2d at 41; *see also Buckman*, 190 Wn.2d at 64. "We apply the same prejudice standard to ineffective assistance claims brought in a personal restraint petition as we do on appeal." *Lui*, 188 Wn.2d at 538. "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" for PRP purposes. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

### III. AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Schirato argues that the search and seizure violated his constitutional rights to be free from warrantless searches and seizures because the warrant affidavit contained material false statements and material omissions made intentionally or recklessly. Schirato argues that his trial counsel was constitutionally ineffective because he failed to move to suppress the evidence seized from his home for lack of probable cause or under *Franks*, 438 U.S. at 155-56. We reject both arguments.

A. <u>Search Warrants and *Franks*</u>

Evidence seized pursuant to a search warrant must be suppressed if probable cause does not support the warrant. *See State v. Betancourth*, 190 Wn.2d 357, 364, 413 P.3d 566 (2018). "Probable cause exists where . . . facts and circumstances . . . establish a reasonable inference that the defendant is involved in criminal activity and . . . evidence of the crime can be found at the

place to be searched." *State v. Scherf*, 192 Wn.2d 350, 363, 429 P.3d 776 (2018). "Probable cause requires more than suspicion or conjecture, but . . . not . . . certainty." *State v. Chenoweth*, 160 Wn.2d 454, 476, 158 P.3d 595 (2007). We generally defer to the magistrate's determination of probable cause and resolve doubts in favor of the warrant's validity. *Scherf*, 192 Wn.2d at 363.

Courts presume the validity of an affidavit in support of a search warrant. *Franks*, 438 U.S. at 171. But if a "defendant makes a substantial preliminary showing that" a search warrant affidavit contains "a false statement [made] knowingly and intentionally, or with reckless disregard for the truth . . . and if the allegedly false statement is necessary to the finding of probable cause," then "the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155-56. At a *Franks* hearing, the defendant must then establish the affidavit supporting the warrant contained a false statement or material omission by a preponderance of the evidence. *Id.* at 156; *Chenoweth*, 160 Wn.2d at 469. The *Franks* standard applies to both material misrepresentations and material omissions. *Chenoweth*, 160 Wn.2d at 469.

To establish a false statement or material omission by a preponderance of the evidence, "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. The defendant must support their allegations with an offer of proof and "a statement of supporting reasons." *Id.* If the defendant meets their burden, "the material misrepresentation will be stricken from the affidavit and a determination made whether, as modified, the affidavit supports a finding of probable cause." *Chenoweth*, 160 Wn.2d at 469 (citing *Franks*, 438 U.S. at 171-72). If the modified "affidavit fails to support probable cause, the warrant will be held void and evidence obtained pursuant to it excluded." *Id*.

B.        Application of *Franks* and *Chenoweth* to This Warrant

Schirato argues the trial court improperly issued the search warrant without probable cause and his counsel was ineffective for failing to move to suppress the fruits of the search. We disagree.

According to the affidavit, Schirato told Johnson that he "drove a small silver Mazda SUV." Br. of Pet'r at 20; PRP at 53. Schirato did own a silver Mazda, but it was a sedan, not an SUV, and Schirato asserts he never said he owned an SUV. The affidavit also stated, "Schirato drives a similar vehicle to the suspicious vehicle seen in AL's driveway two weeks prior to the assault," and described the vehicle as a small silver SUV. Br. of Pet'r at 20; PRP at 54.

Schirato also argues that the affidavit contained intentional or reckless material omissions because it did not include evidence about other neighborhood men acting suspiciously and AL's past boyfriends. The affidavit also did not include all of Kirkpatrick's comments about seeing a possible Toyota Prius, Subaru Outback, and/or Nova style vehicle or vehicles approaching AL's house in the weeks before the incident. Instead, the affidavit stated that Kirkpatrick had seen a suspicious small silver SUV three times in the two weeks before the assault.

Woodrow explains that because the cumulative effect of all the evidence tying Schirato to the scene would "be sufficient for a magistrate to issue a search warrant even if the vehicle identification was redacted from the affidavit," he had no reason to bring a suppression motion or a *Franks* motion that would have been unsuccessful. Resp., App. II at 2. We agree that even if the statements and omissions Schirato has identified were material and made intentionally or recklessly, an issue we need not decide, an affidavit modified to correct or omit these alleged errors would still have established probable cause for the search warrant. Even without any discussion of vehicles and with the addition of Kirkpatrick's comments about AL's former boyfriends,

15

neighborhood men, and other possible suspicious vehicles, the affidavit contained sufficient evidence connecting Schirato to the charged offenses.

The affidavit noted that shoe prints that were consistent with the shoes Schirato wore to the December party were found in AL's yard, circling her house. The affidavit also stated that Schirato had a past sexual relationship with AL, he bought her drinks and encouraged her to drink in excess that night, and she had awoken to him fondling her in her sleep twice before, including inserting his finger into her vagina. In the weeks before the holiday party, Schirato made comments to AL about her body, asked to see photos of her in a bikini, said he was jealous of her boyfriend, and asked to sleep at her house after he had been drinking. Schirato had been to AL's house before. The affidavit also stated that Schirato had previously been investigated for fondling a 16-year-old girl while she was sleeping. This information supported reasonable inferences that Schirato was involved in criminal activity sufficient to grant the warrant. *Scherf*, 192 Wn.2d at 363.

We conclude that the trial court would not have granted a motion to suppress for lack of probable cause or based on *Franks*. Admitting evidence from the search did not violate Schirato's right to be free from unlawful search and seizure. Woodrow explains he had no reason to bring a suppression motion or a *Franks* motion that would have been unsuccessful. We agree and conclude Schirato has failed to show that defense counsel was deficient for failing to bring a motion to suppress evidence seized during the search of his home. *See Linville,* 191 Wn.2d at 524-25.

We hold that Schirato has failed to establish a violation of his constitutional rights related to the search warrant.

## IV. *FRYE* MOTION

Schirato argues that his trial counsel was ineffective by not moving to exclude testimony about Van Wyk's glass testing under *Frye*. Because the FBI lab concluded the glass fragments

from Schirato's clothing were too small for its refractive index analysis, Schirato argues that Van Wyk failed to employ generally accepted scientific techniques by conducting refractive index analysis on small fragments. We reject Schirato's argument and hold that Woodrow was not deficient because *Frye* only applies to new scientific techniques and refractive index analysis was not new.

"Washington uses the [*Frye* test] to limit expert testimony to principles generally accepted in the scientific community." *State v. Murry*, 13 Wn. App. 2d 542, 547, 465 P.3d 330, *review denied*, 196 Wn.2d 1018 (2020). "While *Frye* governs the admissibility of novel scientific testimony, the application of accepted techniques to reach novel conclusions does not raise *Frye* concerns." *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 919, 296 P.3d 860 (2013). Under *Frye*, we look to whether "accepted and reliable mechanisms" exist for implementing a scientific theory. *Id.* at 920. Where there exist "protocols for assuring reliability, an expert's errors in applying proper procedures go to the weight, not the admissibility, of the evidence, unless the error renders the evidence unreliable." *Id.*

Here, refractive index analysis is a well-established technique for forensic glass analysis. Woodrow states in his declaration that he strategically decided not to move to exclude the results of the glass testing under *Frye* because "[t]esting by glass experts has been occurring for decades. None of the science of examination or interpretation is new or novel. There is no disagreement among scientist[s] in the field of the science, methods or interpretation of glass examinations." Resp., App. II at 10. At trial, Schirato's own expert explained that refractive index analysis was a standard scientific technique. And the Oregon State Police forensic scientist who peer reviewed Van Wyk's report agreed that Van Wyk used "methods generally accepted within the scientific community as reliable for analytical comparison of glass particles." Resp., App. I, at 2. Conflicting

expert testimony about the accuracy of Van Wyk's analysis raised issues about the weight the jury would give the evidence but did not implicate *Frye.*

We hold that Woodrow did not provide ineffective assistance by failing to seek a *Frye* hearing.

## V. OTHER INEFFECTIVE ASSISTANCE ARGUMENTS

### A. Failure to Call FBI Scientist

Schirato asserts that his counsel was ineffective for not interviewing or presenting the testimony of the FBI scientist who concluded that the glass fragments on Schirato's clothing were too small for the FBI lab to conduct a refractive index analysis. We disagree.

Ineffective assistance of counsel claims may be based on counsel's failure to adequately investigate a potential defense. *See, e.g.*, *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 739, 101 P.3d 1 (2004). "[D]efense counsel has an obligation to 'provide factual support for [the] defense where such corroboration is available.'" *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995)). The petitioner must show a "reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Id.* With regard to counsel's duty to present expert testimony, the Supreme Court has recognized that the decision not to put on a defense expert may be a reasonable trial strategy. *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 693, 363 P.3d 577 (2015).

Schirato's counsel's failure to call the FBI scientist to testify or to interview the scientist did not fall below an objective standard of reasonableness. *Lui*, 188 Wn.2d at 538. Woodrow identifies strategic reasons not to call the FBI scientist as a witness. Woodrow decided to present the FBI scientist's conclusions through his own expert Palenik, who reviewed the FBI report,

rather than calling an additional expert. *Khan*, 184 Wn.2d at 693. The absence of testimony from the FBI scientist allowed Woodrow to question whether the glass samples that had been provided to the FBI were still in their original condition when Van Wyk tested them. And calling the FBI scientist to testify would have subjected them to cross-examination by the State, which could have rendered their testimony more harmful than helpful. Seeking to avoid this risk was a reasonable strategic decision. *See id.* Here, there are identified, legitimate strategic reasons for not calling the FBI scientist to testify. *See Linville,* 191 Wn.2d at 524-25.

We conclude that Schirato's counsel did not perform deficiently when he did not interview or call the FBI scientist to testify.

B.      Palenik's Testimony

Schirato argues Woodrow was ineffective by allowing Palenik to agree with the State that the glass on Schirato's suit could have come from AL's door. Schirato also argues that Woodrow was ineffective for failing to have a defense expert retest the glass. We reject these arguments.

Palenik's testimony did not support the State as Schirato contends. Rather, Palenik steadfastly maintained, consistent with his pretrial report, that Van Wyk's methods were sloppy. And Woodrow used Palenik's report to effectively cross-examine Van Wyk and argue in closing that the jury should reject Van Wyk's conclusions about the glass evidence. On cross-examination, Palenik acknowledged that *based on Van Wyk's analysis* of the glass, the glass could have come from the same source. And when the prosecutor informed Palenik on cross-examination that Van Wyk had discarded the data with the highest relative standard deviations, Palenik testified that this information reduced his concerns somewhat, but he continued to testify that Van Wyk's imprecision undermined likelihood that the glass fragments could have been from the same source, In closing, Schirato's trial counsel argued that because Van Wyk's methodologies were imprecise,

the only valid conclusion the jury could draw was that glass of an unknown source was found on Schirato's clothing.

Palenik's testimony supported the reasonable defense strategy of casting doubt on the reliability of the scientific data that the State used. *See, e.g.*, VRP (Jan. 23, 2018) at 1242-46. To the extent Schirato argues that Woodrow should have asked Palenik or another defense expert to retest the glass, Woodrow explains that not doing so was a strategic decision because testing might have confirmed the State's conclusions. *See Linville,* 191 Wn.2d at 524-25.

We hold that Woodrow did not provide ineffective assistance by calling Palenik as a witness and by opting not to have him retest the glass.

C.    1971 Scientific Journal Article

Schirato argues that his trial counsel was ineffective for not introducing at trial a 1971 scientific journal article about glass fragments found on men's clothing that had been brought to a British dry cleaner. According to Schirato, this article would have helped the jury conclude that there were innocent explanations for why glass was found on Schirato's wool suit after dry cleaning. We disagree.

We agree with Woodrow that it was a strategic choice not to introduce this article because doing so would have prompted the State to introduce more recent studies that discredited the 1971 article. *See id*. A decision to avoid opening the door to damaging rebuttal evidence is a reasonable tactical decision. *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 451, 21 P.3d 687 (2001). The article was over 45 years old. Had Woodrow used the 1971 article at trial, the State could have introduced "damaging rebuttal evidence," in the form of more recent studies that cast doubt on the 1971 article. *Yates*, 177 Wn.2d at 46.

We hold that Woodrow did not provide ineffective assistance by declining to introduce the 1971 article at trial.

D.      Failure to Object to Hearsay

Schirato argues that his trial counsel was ineffective by failing to object to a hearsay statement during AL's direct examination. Specifically, Schirato argues that Woodrow should have objected when AL testified that her boyfriend told her that he had not been at her house during the night of December 17-18, 2014. We disagree.

Decisions about whether and when to object are strategic decisions for counsel. *State v. Martinez*, 2 Wn. App. 2d 55, 78, 408 P.3d 721, *review denied*, 190 Wn.2d 1028 (2018). Had Woodrow objected, he might have drawn more attention to the fact that Anderson said he was never at AL's home that night. Moreover, AL also said that Anderson raised the possibility of her having brought someone home with her, a possibility that would be helpful to the defense. The fact that AL volunteered a hearsay statement helpful to the defense in the same breath emphasizes that strategic reasons existed for Woodrow not to object. *See id.*

We hold that Woodrow did not provide ineffective assistance by failing to object to hearsay statements.

E.      Prosecutor's Comment in Closing Argument that the Glass Fragments "Matched"

Schirato claims his counsel was ineffective by not objecting to the "false and misleading" comment in the State's closing rebuttal argument that the glass from Schirato's clothing "matched" the glass in AL's window. Br. of Pet'r at 45-46.

The decision to object is a matter of trial tactics, and "prosecuting attorneys have wide latitude to argue facts and reasonable inferences from the evidence," so long as they do not "make

prejudicial statements unsupported by the record." *Lui*, 188 Wn.2d at 557. This court considers the entire argument in context. *See State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011).

In context, the prosecutor's comment that the glass "matched" was not misleading. VRP (Jan. 23, 2018) at 1221. Before inferring that the glass from Schirato's clothes "matched" the glass from AL's window, the prosecutor reminded the jury that although Van Wyk explained why scientists do not use the word "match" for glass evidence unless the pieces physically fit together, Van Wyk concluded that the glass could have been from the same source. *See* VRP (Jan. 23, 2018) at 1221; VRP (Jan. 16, 2018) at 688. Moreover, Woodrow's declaration states that he strategically opted not to object because he believed the defense had a strong argument that the glass on Schirato's suit could have originated anywhere. And an objection could have led to additional discussion from the prosecutor about Van Wyk's precise results. The decision not to object was strategic.

We hold that Woodrow did not provide ineffective assistance by failing to object to the State's closing argument inference that the glass evidence matched.

F.      Prosecutor's Comment that AL Gave Truthful Testimony

Schirato contends that his trial counsel was ineffective by not objecting to a comment in the State's closing argument he claims was improper vouching. We disagree.

Although an attorney may not personally vouch for a witness's credibility, the "[p]rosecutor[] may . . . argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wash. App. 340, 344, 698 P.2d 598 (1985)).

The prosecutor stated, "[AL] got up there and told you what happened, told you what she remembered and did so to the best of her ability. She swore to tell the truth and she did so." VRP (Jan. 23, 2018) at 1262. Even if Woodrow's failure to object were deficient performance, an issue we need not decide, there is no evidence that an objection to this comment, if sustained, would have reasonably changed the outcome. *Lui*, 188 Wn.2d at 538. AL could not identify her attacker, and the State's case did not hinge on AL's testimony. The State presented evidence that DNA consistent with a mixed profile of Schirato's and AL's DNA was on AL's bra clasp even though she never wore that bra outside her home, shoe prints found outside AL's house were consistent with Schirato's shoes, and glass fragments on Schirato's clothing were consistent with glass in AL's door.

We hold that Schirato's counsel was not constitutionally ineffective by failing to object to the State's suggestion that AL was a credible witness.

G.     Cumulative Error

Schirato argues that this court should grant his PRP or, at a minimum, remand for a reference hearing on the basis of cumulative error. Because Schirato has not established any error entitling him to relief, his cumulative error claim fails.

CONCLUSION

We deny Schirato's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Worswick, P.J.

Melnick, J.P.T.